304 P.3d 1098

CABLE ONE, INC., a Delaware corporation, Plaintiff/Appellee,

v.

ARIZONA DEPARTMENT OF REVENUE; Cochise County; Coconino County; Gila County; Graham County; Greenlee County; Maricopa County; Navajo County; and Yavapai County, Defendants/Appellants.

No. 1 CA–TX 12–0006.

Court of Appeals of Arizona, Division 1, Department T.

June 11, 2013.

Steptoe & Johnson LLP, By Patrick Derdenger and Bennett E. Cooper, Phoenix, And Cahill Gordon & Reindel LLP By Chérie R. Riser admitted pro hac vice, Washington, D.C., Attorneys for Plaintiff/Appellee.

Thomas C. Horne, Attorney General By Kenneth J. Love, Assistant Attorney General, Phoenix and Amy C. Sparrow, Special Counsel, Chandler, Attorneys for Defendants/Appellants.

## OPINION

NORRIS, Judge.

¶ 1 The Arizona Legislature has directed the Arizona Department of Revenue to value "centrally assessed property." Ariz.Rev. Stat. ("A.R.S.") § 42–14001 (2006). Centrally assessed property includes, for example, mines, mills, smelters, certain utilities, and, at issue here, telecommunications companies. A.R.S. § 42–14401 (2006).

¶ 2 In 2009, the Department concluded Cable One, Inc. was a "telecommunications company" subject to central assessment because, through its Voice over Internet Protocol ("VoIP") service, it was providing telephone service to its subscribers. Cable One disagreed and challenged the Department's decision in the tax court, which ruled in Cable One's favor.

¶ 3 Under the governing statute and facts of this case, however, we agree with the Department. Cable One is using its VoIP service to provide telephone service to its Arizona subscribers, consistent with what it is telling the public in its advertising, "[p]hone service" with "UNLIMITED local & long distance calling in the continental U.S." We therefore reverse the tax court's decision and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

¶ 4 Cable One operates nine separate cable systems in Arizona (Bisbee, Clifton, Cottonwood, Globe, Page, Prescott, Safford, Show Low, and Winslow). It provides cable television, cable broadband (Internet access) service, and in 2006, began to offer VoIP service to its customers in seven out of the nine cable systems. Cable One provides all three services in these systems over the same cable network.

¶ 5 In 2009, for the 2010 tax year, the Department concluded Cable One was using its cable broadband network and VoIP service to provide telephone service to subscribing customers. Accordingly, the Department asserted it was entitled to centrally assess Cable One's property because Cable One met the definition of a telecommunications company under A.R.S. § 42–14401. Section 42–14401 provides:

In this article, unless the context otherwise requires "telecommunications company" means any person that owns communications transmission facilities and that provides public telephone or telecommunications exchange or inter-exchange access for compensation to effect two-way communication to, from, through or within this state.

¶ 6 Cable One protested, but eventually the Department issued a "Notice of Decision" and valued Cable One's property at a full cash value of $14 million for tax year 2010.[1] Subsequently, the State Board of Equalization upheld the Department's decision. Cable One then appealed the Board's decision to the tax court.[2] A.R.S. § 42–14005 (2006).

¶ 7 The parties cross-moved for summary judgment. Although they agreed that under A.R.S. § 42–14401, if a person "owns communications transmission facilities," and "pro-

---

1. During the litigation, the Department increased its full cash value assessment to $39,730,000 for tax year 2011.

2. Cable One also challenged the Department's determination of full cash value, an issue the tax court will need to address on remand. We express no opinion regarding the Department's determination of full cash value.

vides public telephone or telecommunications exchange or interexchange access for compensation to effect two-way communication to, from, through or within this state," that person was a "telecommunications company," they disagreed whether Cable One's VoIP service satisfied those requirements.

¶ 8 Essentially, the Department took the position Cable One's VoIP service was a form of telephone service that allowed its customers to receive calls from, and place calls to, the traditional, circuit-switched telephone network known as the "public switched telephone network," or PSTN. Thus, according to the Department, Cable One met the requirements of A.R.S. § 42–14401 -- it owned "communications transmission facilities," specifically, its cable broadband network, and provided its customers with "public telephone or telecommunications exchange or inter-exchange access for compensation to effect two-way communication to, from, through or within this state."

¶ 9 In response, Cable One argued its VoIP service was not a telephone service, but instead was an "[I]nternet protocol enabled service." Cable One emphasized that its cable broadband network was not part of the PSTN, it did not operate, interconnect or "interface[ ]" with the PSTN, and it relied on a third-party telecommunications company, Level 3 Communications, Inc., for all PSTN-based services.[3] Accordingly, it argued it did not own any communications transmission facilities and did not provide any PSTN-based services, and thus, was not a telecommunications company subject to central assessment by the Department.

¶ 10 Given the competing arguments of the parties and their divergent description of VoIP service, we turn to the obvious questions: What is VoIP service, how does it work, and what, if anything, does VoIP service have to do with the PSTN?

¶ 11 Broadly speaking, VoIP service is an Internet application that uses an Internet protocol ("IP") to transmit voice communications over a broadband Internet connection.[4] *Minn. Pub. Utils. Comm'n v. F.C.C.*, 483 F.3d 570, 574 (8th Cir.2007). In that respect, VoIP service differs from the circuit-switched technology traditionally used for transmitting voice communications over the PSTN. *Id.* In circuit-switched communications, an electrical circuit between two points must be kept open and clear of other signals for the duration of the call. *Id.;* Clinton Howard Brannon, Commentary, *Reach Out and Tax Someone: What Does the Future Hold for the Taxation and Regulation of Voice over Internet Protocol Telephone Service*, 57 Ala. L.Rev. 173, 174 (2005).[5] In contrast to PSTN circuit-switched technology, Cable One's VoIP service uses "packet-routed" technology to transmit voice signals. Through an embedded multimedia terminal adapter, called an EMTA, which is installed in a Cable One customer's home, a customer's voice communication[6] is converted into

---

3. Cable One also described its VoIP service as "interconnected," as that term has been defined by Congress in the 2010 amendments to the Communications Act of 1934. 47 U.S.C. § 153(25) (2011) (defining "[i]nterconnected VoIP service" as adopted by the Federal Communications Commission ("FCC") in 47 C.F.R. § 9.3 (2011)). As defined by the FCC, interconnected VoIP is a service that "[e]nables real-time, two-way voice communications," "[r]equires a broadband connection from the user's location," "[r]equires Internet protocol-compatible customer premises equipment," and "[p]ermits users generally to receive calls that originate on the public switched telephone network and to terminate calls to [that] network." 47 C.F.R. § 9.3.

4. Not every provider of VoIP service provides it the same way. Marc Elzweig, *D, None of the Above: On the FCC Approach to VoIP Regulation*, 2008 U. Chi. Legal F. 489, 492 (2008). For example, VoIP can be "nomadic" or "fixed."

Nomadic VoIP service allows a customer to use the service anywhere the customer can acquire a broadband Internet connection. *Minn. Pub. Utils. Comm'n v. F.C.C.*, 483 F.3d 570, 575 (8th Cir.2007). Fixed VoIP service allows a customer to use the service only from a fixed location, such as from the customer's home. *Id.* Cable One offers fixed VoIP service.

5. "Telephone service carried by the PSTN is often called 'Plain Old Telephone Service' ('POTS')." *Mayor & City Council of Baltimore v. Vonage Am. Inc.*, 544 F.Supp.2d 458, 462 n. 7 (D.Md.2008).

6. A Cable One customer need not subscribe to Cable One's VoIP service, but to use its VoIP service, a Cable One customer must subscribe to Cable One's cable broadband service.

digital data packets. Cable One then routes the call (more specifically, the data packets in IP format) over its cable broadband network to a "headend."

¶ 12 From the "headend"—and this fact is important in this case—if the customer has called a customer of another telephone service provider or a Cable One customer served by a different Cable One system (for example, Safford to Prescott), Cable One "hands-off" the call (again, the data packets) to Level 3. *See infra* ¶ 32. Level 3 converts the call (data packets) from IP format to a different format—a time-division multiplexing ("TDM") format—that can be transmitted over the PSTN. VoIP calls cannot be connected to users on the PSTN unless they are first converted to TDM format, and Level 3 performs this conversion, not Cable One. For the sake of simplicity, we refer to calls Cable One "hands-off" to Level 3 as "external calls." [7] A call to a Cable One VoIP customer by a customer of another telephone provider or a Cable One customer from a different Cable One system works the same way, but in reverse. If, however, a Cable One customer is calling (or receiving) a call from another person who is also a Cable One VoIP customer within the same Cable One system (for example, Prescott to Prescott), Cable One does not "hand[ ]-off" the call to Level 3—the call stays on Cable One's cable broadband network for transmission and delivery by Cable One. For the sake of simplicity, we refer to the calls Cable One does not "hand[ ]-off" to Level 3 as "internal calls."

¶ 13 Relying on Cable One's arrangement with Level 3, the tax court ruled for Cable One. Although it found Cable One owned "communications transmission facilities" because it was using its cable network to connect to its customers' phones, it agreed with Cable One that it was not a telecommunications company because it was not connecting a caller's line to a recipient's line over the PSTN. Reasoning "the essential purpose of telephone service is to connect a caller with a person or device in some other location," the tax court found this point of connection belonged to Level 3, not Cable One. It thus concluded Cable One was not subject to central assessment by the Department.[8]

## DISCUSSION

### I. Statutory Construction

¶ 14 Emphasizing A.R.S. § 42–14401 does not mention the PSTN and asserting the statute is clear and unambiguous on its face, the Department argues this statute is not limited to telecommunications companies that directly connect to the PSTN. Although it acknowledges Cable One's VoIP service involves Internet technology, the Department asserts Cable One is nonetheless transmitting voice communications over its cable broadband network. Thus, the Department argues Cable One owns "communications transmission facilities" and is providing "telecommunications exchange or inter-exchange access" and is, therefore, a telecommunications company under A.R.S. § 42–14401.[9]

¶ 15 In contrast, Cable One argues the requirements of the statute, "communications transmission facilities" and "telecommunications exchange or inter-exchange access," are

---

7. Cable One pays Level 3 for its PSTN "interface" services.

8. Whether the Department is entitled to centrally assess Cable One's property has significant financial consequences. According to Cable One, the Department's valuation of its property at a full cash value of $39,730,000, *see supra* note 1, is more than five times the value determined by the county assessors in tax year 2009.

9. As they did in the tax court, on appeal the parties also dispute the meaning of "public telephone" in the phrase "provides public telephone or telecommunications exchange or inter-exchange access." A.R.S. § 42–14401. The Department argues "public telephone" modifies the word "access," and thus a "telecommunications company" includes a person who is providing "public telephone access." Relying on the last antecedent rule, *Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.*, 165 Ariz. 31, 34, 796 P.2d 463, 466 (1990), Cable One counters the word "access" cannot be "append[ed]" to "public telephone," and instead refers either to a public service corporation that provides common carrier services and is also subject to the jurisdiction of the Arizona Corporation Commission, or to pay-phones. We do not need to resolve these arguments because Cable One provides "telecommunications exchange or inter-exchange access" and is therefore subject to central assessment by the Department.

terms of art that have well-recognized legal meanings, all of which relate to the PSTN. Thus, according to Cable One, "communications transmission facilities" refers to facilities used to provide PSTN-based services and "telecommunications exchange or inter-exchange access" pertains only to calls that originate or terminate to or from the PSTN.

¶ 16 In our view, the Department and Cable One are each partially right and partially wrong. Although as the Department correctly notes, the Legislature incorporated some words into A.R.S. § 42–14401 that have a clear meaning -- such as "communications," "facilities" and "access" -- it also combined those words with other words or phrases that in the 1980s, as Cable One correctly notes, were developing a more technical, legal meaning in the telecommunications industry. Thus, we are presented with a statute that is neither clear nor plain on its face.

¶ 17 Our task, therefore, is to construe A.R.S. § 42–14401, and attempt to "fulfill the intent of the legislature that wrote it." *State v. Williams,* 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). To do this, we exercise de novo review and apply well-established principles of statutory construction. *Sw. Airlines Co. v. Ariz. Dep't. of Revenue,* 217 Ariz. 451, 452, ¶ 6, 175 P.3d 700, 701 (App.2008). We consider the context of the statute, its language, subject matter, historical background, effects and consequences, and its purpose. *Wyatt v. Wehmueller,* 167 Ariz. 281, 284, 806 P.2d 870, 873 (1991); A.R.S. § 1–213 (2002) ("Words and phrases shall be construed according to the common and approved use of the language. Technical words and phrases and those which have acquired a peculiar and appropriate meaning in the law shall be construed according to such peculiar and appropriate meaning."). And, we consider the statute's development and subsequent history, as legislative intent "often can be discovered by examining the development of a particular statute." *Fid. Nat. Fin. Inc. v.*

*Friedman,* 225 Ariz. 307, 310, ¶ 15, 238 P.3d 118, 121 (2010).

¶ 18 Having done this, and as we explain below, we agree with the Department A.R.S. § 42–14401 is not limited to companies that directly connect to the PSTN. And, we also agree with the Department that through its VoIP service, Cable One is providing "telecommunications exchange or inter-exchange access for compensation to effect two-way communications to, from, through or within this state." A.R.S. § 42–14401.

¶ 19 We begin our task by examining the statutory scheme for central assessment and tax classification in effect before 1985 -- a scheme that included both telephone companies and what was then known as "microwave services" property.

### A. House Bill 2157

¶ 20 Before 1985, the statutory scheme authorized the Department to centrally assess telephone companies. The applicable statute defined a "telephone company" as "a person engaged in this state in the business of transmitting telephonic messages to, from, through or within the state." A.R.S. § 42–791(2) (1980), *amended by* 1985 Ariz. Sess. Laws, ch. 317, § 3, 1109 (1st Reg.Sess.). The statutory scheme also authorized the Department to centrally assess "the property of all microwave services operating within the state, except microwave facilities related to community antenna television systems operating entirely within a single county" ("microwave services statute"). A.R.S. § 42–124.03 (1980), *repealed by* 1985 Ariz. Sess. Laws, ch. 317, § 1, 1107 (1st Reg.Sess.). The Legislature did not define "microwave services," although we take judicial notice that by 1985, businesses were using microwave transmission systems to transmit long-distance voice or data communications, either for their own use or for the use of others through what was known as point-to-point private line services.[10] For purposes of de-

---

**10.** For a general history of privately owned microwave systems and private line services, *see* Susan E. McMaster, The Telecommunications Industry 57, 73–74, 85–87, 98–110 (Larry L. Duetsched, 2002); Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law,* 98 Colum. L.Rev. 1323, 1343–

44 (1998); Manley R. Irwin, *The Communication Industry and the Policy of Competition,* 14 Buff. L.Rev. 256 (1964); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,* 740 F.2d 980, 985–88 (D.C.Cir. 1984); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081, 1093–99 (7th Cir.1983).

termining the property's taxable value, the property tax classification system in effect before 1985 categorized property owned by telephone companies as class two property.[11] A.R.S. § 42–136(2)(a) (1980), *amended by* 1985 Ariz. Sess. Laws, ch. 317, § 2, 1107–09 (1st Reg.Sess.). The classification system, however, did not include microwave services property in any specific class. Thus, it was unclear whether microwave services property used in the transmission of long-distance voice or data communication constituted class two property, or instead, class three property, which was the class reserved for property "devoted to any commercial or industrial use" not included in any other class. A.R.S. § 42–136(3) (Supp.1984).

¶ 21 In 1985, through House Bill ("H.B.") 2157, the Legislature eliminated the "telephone company" definition, repealed the microwave services statute, and enacted a unitary definition of "telecommunications company." 1985 Ariz. Sess. Laws, ch. 317, § 1, 1107, § 3, 1109 (1st Reg.Sess.). Originally codified as A.R.S. § 42–791 (1985), the telecommunications company definition the Legislature adopted will look familiar:

> "Telecommunications company" means any person owning communications transmission facilities and who provides public telephone or telecommunications exchange or inter-exchange access for compensation to effect two-way communication to, from, through or within the state.

1985 Ariz. Sess. Laws, ch. 317, § 3, 1109 (1st Reg.Sess.).

¶ 22 Why did the Legislature make these changes? Based on our review of the historical background and wording of A.R.S § 42–791 (which as re-codified eventually became A.R.S. § 42–14401),[12] we believe the Legislature made these changes for two reasons: first, to clarify that a company transmitting communications -- regardless of the technology used to do so -- would be considered a telecommunications company and subject to uniform tax treatment by the Department, and second, to conform to changes in the telecommunications industry that concerned both local and long-distance telephone service and who could provide those services.

## B. Uniform Treatment

¶ 23 As noted above, by 1985, businesses were using microwave transmission facilities to transmit long-distance voice communications. Although the then-existing statutes classified property used in the operation of a telephone company as class two property, whether microwave services property used to transmit long-distance voice communication also constituted class two property, was uncertain. *See supra* ¶ 20. The Legislature resolved this uncertainty by simultaneously repealing the microwave services statute and specifying that property used in the operation of a telecommunications company would be class two property subject to central assessment. 1985 Ariz. Sess. Laws, ch. 317, §§ 1–3, 5, 1107–10 (1st Reg.Sess.). Instead of attempting to describe the type of technology a taxpayer would have to employ to qualify as a telecommunications company, the Legislature simply described a telecommunications company in terms of function ("communications transmission facilities") and product ("provides ... telecommunications exchange or inter-exchange access ... to effect two-way communication"). A.R.S. § 42–791 (1985). Thus, whether the taxpayer used microwave services or some other technology in its communications transmission facilities to provide the product became immaterial.

¶ 24 Our conclusion that, by enacting H.B. 2157, the Legislature adopted a telecommunications company definition that focused on function and product instead of type of technology is supported by a contemporaneous summary of H.B. 2157, prepared by the House of Representatives Research Staff.

---

11. For property tax purposes, the Legislature has segregated property into separate classifications or categories and has assigned different tax burdens to the various classifications of property. In 1985, A.R.S. § 42–136 (Supp.1984), which identified the property classes, was re-codified as A.R.S. § 42–162 (Supp.1985). 1985 Ariz. Sess. Laws, ch. 366, § 11, 1472–73, § 20, 1494–95 (1st Reg.Sess.). The current classes are identified in Title 42, Chapter 12, Article 1.

12. 1997 Ariz. Sess. Laws, ch. 150, § 172, 1176 (1st Reg.Sess.).

According to the summary, the purpose of H.B. 2157 was to provide

> statutory clarification of the classification of telecommunication companies for property tax purposes.... Due to technological changes, the proper area for classifying certain long distance telephone companies was unclear. A decision by the Board of Tax Appeals had placed the newer phone service companies in class 3 (general commercial). This bill replaces the definition of telephone and telegraph companies with a telecommunication definition.

Ariz. House of Representatives Research Staff, Summary of Appropriations and Significant Legislation of the Thirty–Seventh Arizona Legislature First Regular Session -- 1985, at 217.[13] Although the summary does not identify the "technological changes" that prompted the Legislature's action, given the Legislature's simultaneous repeal of the microwave services statute and its adoption of a unitary definition of telecommunications company, we conclude the Legislature was taking aim at businesses transmitting long-distance telephone communications using microwave services property.

### C. Changes in the Industry

¶ 25 In 1985, when the Legislature enacted the telecommunications company definition that focused on function and product, the telecommunications industry was undergoing profound changes concerning local and long-distance telephone service and who could provide those services. Consistent with these changes, the Legislature used, with minor variation, the technical terms for local and long-distance telephone service in describing the product a telecommunications company had to provide to fall within what was then A.R.S. § 42–791 (1985).

¶ 26 These changes arose out of an antitrust action filed by the federal government against AT&T, the dominant player in the telecommunications industry. *See generally United States v. Am. Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982) (subsequent history omitted). Eventually, pursuant to a consent decree, the district court ordered AT & T to divest itself of its 22 "[o]perating [c]ompanies," which had provided local telephone service to subscribers throughout the United States. *Id.* at 141, 226–29.[14] The consent decree allowed the divested companies to continue providing what the court called "exchange telecommunications," that is, telephone service in a defined geographical area known as an "exchange area." [15] *Id.* at 141, 228–29. Using more familiar terms, the court explained "exchange telecommunications" meant local telephone service. *Id.* at 141 n. 37.[16] Although the decree allowed the

---

13. Generally courts will give little or no weight to statements made by non-legislators. *Estate of Hernandez by Hernandez–Wheeler for & on Behalf of Hernandez v. Ariz. Bd. of Regents*, 177 Ariz. 244, 251 n. 6, 866 P.2d 1330, 1337 n. 6 (1994). We can rely on such statements, however, if there are "sufficient guarantees that the statements reflect legislators' views." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 270, 872 P.2d 668, 674 (1994); *State v. Fikes*, 228 Ariz. 389, 392, ¶ 11, 267 P.3d 1181, 1184 (App.2011) (relying on comments made by legislative analyst about purpose of legislation). Here, the summary is consistent with the uncertain state of the law regarding the classification of microwave services property before the Legislature enacted H.B. 2157, *see supra* ¶ 20, and provides context and background information.

14. In approving the consent decree, the court explained:

> The key to the Bell System's power to impede competition has been its control of local telephone service. The local telephone network functions as the gateway to individual telephone subscribers. It must be used by long-distance carriers seeking to connect one caller to another.... The enormous cost of the wires, cables, switches, and other transmission facilities which comprise that network has completely insulated it from competition. Thus, access to AT & T's local network is crucial if long distance carriers and equipment manufacturers are to be viable competitors.

*Am. Tel. & Tel. Co.*, 552 F.Supp. at 223.

15. The word "exchange" had developed a technical meaning in the telephone industry long before the breakup of AT&T. An "exchange" is the point where individual telephone users connect to the local "switch," which is the place where the line of the calling party is connected to the line of the called party. In the 1870s, "switching from a calling telephone subscriber to the line of the subscriber called" was manually performed; switching is now automated. *See generally* Anton A. Huurdeman, The Worldwide History of Telecommunications 4–6, 188–98, 237–68, and 480–500 (2003).

16. The court also called this type of service "intraexchange service." *Am. Tel. & Tel. Co.*, 552 F.Supp. at 141 n. 37.

divested companies to provide local telephone service from one point to another point in their designated exchange areas, and to originate or terminate calls to or from another exchange area, it barred the divested companies from transmitting "interexchange telecommunications," which was the portion of the call that went from one exchange area to another exchange area. *Id.* at 141, 227–28. Again using more familiar terms, the court explained "interexchange telecommunications" meant long-distance telephone service. *Id.* at 141 n. 39. The court's decree only allowed "interexchange carriers" to handle the interexchange (long-distance) portion of the call. *Id.* at 141. In short, under the decree, a divested company could provide local telephone service to its customers and allow its customers to either originate or terminate a long-distance call, but only an interexchange carrier could provide the customer with the long-distance service part of the call.

¶ 27 Although the Legislature did not incorporate into A.R.S. § 42–791 the district court's exact terminology, "exchange telecommunications" and "interexchange telecommunications," it adopted terminology -- "telecommunications exchange or inter-exchange access" -- that conformed to the technical terms used by the district court to describe local and long-distance telephone service. In so doing, and then by using the disjunctive "or" in that phrase, the Legislature defined a telecommunications company as a person who provided either one of two products: local telephone service ("telecommunications exchange") or long-distance telephone service ("inter-exchange access"). *State v. Pinto,* 179 Ariz. 593, 595, 880 P.2d 1139, 1141 (App.1994) ("or" is a disjunctive particle used to express an alternative among two or more things) (citation omitted).

### D. Post–H.B. 2157

¶ 28 Beginning in 1986, and for the next 12 years, the Legislature imposed different tax burdens on property used to provide "local telecommunications services" [17] from property used to provide long-distance telecommunications services.[18] But, it left untouched the telecommunications company definition it had enacted in 1985, and continued to require the Department to centrally assess all property of a telecommunications company, regardless of whether the company provided local or long-distance telephone service.

¶ 29 This statutory scheme (as re-codified and re-numbered) remained in place until 1998. In that year, the Legislature amended A.R.S. § 42–14401 and abolished the distinction between local and long-distance telecommunications companies for classification and assessment purposes. 1998 Ariz. Sess. Laws, ch. 220, § 4, 1363 (2d Reg.Sess.). But for the addition of a five-word introductory phrase, *see infra* ¶ 42, the Legislature left untouched the definition of telecommunications company it had adopted in 1985. *Compare supra* ¶ 5 *with supra* ¶ 21.

¶ 30 From this history, we draw the following conclusions: first, in 1985, the Legislature decided the Department would centrally assess the property of all telecommunications companies, just as the Department had been doing for telephone companies and microwave services property; second, the Legislature intended the Department to assess the property of all telecommunications companies regardless of whether they provided local or long-distance service; third, the Legislature described a telecommunications company in practical terms -- describing function ("communications transmission facilities") and product ("provides ... telecommunication exchange or inter-exchange access"). And fourth, although the Legislature's definition of telecommunications company described the product in technical terms, those terms have a familiar ring -- local and long-distance telephone service.

---

**17.** In 1992, the Legislature amended the formula to clarify that revenues from local services did not include cellular mobile service revenues, a change that brought the allocation formula more in line with the Legislature's definition of local telecommunications service. 1992 Ariz. Sess. Laws, ch. 41, § 1, 115 (2d Reg.Sess.).

**18.** We addressed these different methods of valuing the two types of property in *Citizens Telecommunications Co. of White Mountains v. Ariz. Dep't of Revenue,* 206 Ariz. 33, 75 P.3d 123 (App.2003), and *U.S. W. Commc'ns, Inc. v. Ariz. Dep't of Revenue,* 193 Ariz. 319, 972 P.2d 652 (App.1998).

### F. Communications Transmission Facilities

¶ 31 With these conclusions in mind, we turn back to the parties' competing arguments regarding A.R.S. § 42–14401 and whether Cable One is a telecommunications company. We begin with their arguments regarding the meaning of "communications transmission facilities."

¶ 32 As discussed, Cable One uses its cable broadband network to route a call (data packets) in IP format to or from a customer from or to a "headend." *See supra* ¶ 12. According to Cable One's vice president of engineering, a "headend" is a building with "lots of equipment in it," including what is known as a cable modem termination system (CMTS), which Cable One uses to "hand[ ]-off" calls to Level 3. Does this mean Cable One owns communications transmission facilities? The answer is yes.

¶ 33 In 1985, and even today, the word "facility" refers to something created to serve a particular function or something that facilitates an action or process.[19] Here, Cable One is using its cable broadband network, "headend," and associated equipment to facilitate a particular function and action -- to transmit telecommunications. Accordingly, Cable One's argument that it does not own communications transmission facilities because it does not "interface" directly with the PSTN misses the mark. The Legislature did not describe the technology the facilities must use to transmit the communications. Instead, as discussed, the Legislature described the facilities in terms of function: "communications transmission facilities." As long as the facility serves or facilitates the transmission of communications, it is a communications transmission facility. Accordingly, we agree with the Department that "communications transmission facilities" include but are not limited to PSTN facilities.

### G. Telecommunications Exchange or Interexchange Access

¶ 34 This brings us to the next question -- does Cable One provide "telecommunications exchange or inter-exchange access"? As discussed, those terms describe two different products, local (telecommunications exchange) and long-distance (inter-exchange access) telephone service. Thus, the real question is whether Cable One is providing local or long-distance telephone service to its customers. The answer to that question is unquestionably yes, and this is true despite Cable One's arrangement with Level 3.

¶ 35 First, Cable One's arrangement with Level 3 is irrelevant when it comes to "telecommunications exchange," that is, local telephone service. Cable One does not use Level 3 to transmit "internal calls" -- those calls exchanged between one Cable One VoIP customer and another Cable One VoIP customer in the same Cable One system.[20] *See supra* ¶ 12.

¶ 36 Second, for "inter-exchange access," that is, long-distance service, the "external calls" it "hands-off" to Level 3, Cable One is nevertheless providing that service to its subscribing customers. The critical word here is "provide." Section 42–14401 does not distinguish between a person who provides long-distance service directly to the end user and a person who provides long-distance service to the end user through its own technology and technology it obtains from a third party. The relationship between Cable One and Level 3 is analogous to a wholesaler-retailer relationship. Indeed, in the tax court, Cable One's telecommunications expert described Level 3 as providing wholesale telecommunication services to Cable One.

¶ 37 In *Mayor and City Council of Baltimore v. Vonage America Inc.*, 544 F.Supp.2d 458 (D.Md.2008), the court rejected a VoIP provider's argument, similar to what Cable

---

19. Webster's II New Riverside University Dictionary 460 (1984); Ninth New Collegiate Dictionary 444 (1983); Webster Illustrated Contemporary Dictionary 254 (1982); Webster's Third New International Dictionary 812–13 (1981); *see also* American Heritage Dictionary of the English Language 633 (4th ed. 2006).

20. Even if Cable One was using Level 3 to transmit internal calls, Cable One would nevertheless be indirectly providing local telecommunications service to its customers. *See infra* ¶¶ 36–38.

One has argued here, that it was not subject to a municipal tax on the sale of "telecommunications lines" because it did not directly connect its customers' calls to the PSTN, but contracted with third-party telephone carriers who did. *Id.* at 462–63, 469.

¶ 38 In rejecting the provider's argument, the court explained the VoIP provider was *providing* its customers with the connections necessary to complete their calls:

> What is critical is that [the provider] is selling a service that *includes* the use of a "telecommunication line" within the definition of the Telecommunications Tax.... In the instant case, because every call that a [provider] subscriber makes to or receives from a non-[provider] subscriber must travel over a wired connection, it is reasonable to conclude that [the provider] sells a telecommunications line to its subscribers. [Its] contention that it merely "uses" the wired connection offered by "contracted third-party telephone carriers [which] are responsible for providing the wired ... connections required for completion of a [provider] call," ... misstates the reality of the situation. Although these third-party carriers provide the wired connection *to* [the provider], it is [the provider], *not* these carriers, which provides this connection to [the] customers.

*Id.* at 472 (emphasis in original). *See also In re Universal Serv. Contribution Methodology*, 21 F.C.C.R. 7518, 7539–40, ¶ 41 (2006), *aff'd in relevant part, Vonage Holdings Corp. v. F.C.C.*, 489 F.3d 1232 (D.C.Cir.2007). There, the FCC classified interconnected VoIP providers as "provider[s] of interstate telecommunications":

> [W]e find interconnected VoIP providers to be "providing" telecommunications regardless of whether they own or operate their own transmission facilities or they obtain transmission from third parties. In contrast to services that merely use the PSTN to supply a finished product to end users, interconnected VoIP supplies PSTN transmission *itself* to end users.

*Id.* (emphasis in original).

¶ 39 Here, as discussed, Cable One provides its customers with access to the PSTN. To assert otherwise -- as the court in *Mayor* put it -- "misstates the reality of the situation." 544 F.2d at 472.

¶ 40 To sum up, Cable One owns communications transmission facilities. And, through its VoIP service, it provides "telecommunications exchange or inter-exchange access," which, using more familiar terms, is what it is advertising to the public: "[p]hone service" with "UNLIMITED local & long-distance calling in the continental U.S." Cable One is, therefore, a "telecommunications company" under A.R.S. § 42–14401 and subject to central assessment by the Department.

## II. Additional Arguments

¶ 41 Before concluding, we pause to address five additional arguments raised by Cable One in support of the tax court's ruling. First, it argues it cannot be centrally assessed as a telecommunications company because the "predominant use of its Arizona property is to provide cable television services," not VoIP service. Section 42–14403, however, requires the Department to value "the property of all telecommunications companies operating in this state." A.R.S. § 42–14403 (Supp.2012). The statutory scheme does not refer to predominant use.

¶ 42 Second, Cable One argues it is not a "telecommunications company" because it uses its cable broadband network primarily to provide cable television services. Relying on the prefatory phrase in A.R.S. § 42–14401 -- "unless the context otherwise requires" -- Cable One argues this "context" should exempt it from the statute. We reject this argument. Although this prefatory phrase may allow some flexibility in interpreting or applying A.R.S. § 42–14401, *see Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 74, ¶ 14, 97 P.3d 896, 899 (App.2004) (interpreting "unless the context otherwise requires" in another statute), that flexibility does not allow us to disregard legislative intent or to read into the statute terms, limits, or requirements that are simply not there. Predominant or primary use is not an element of A.R.S. § 42–14401 or of the other statutes pertaining to central assessment of telecommunications companies, and Cable One's "unless the context otherwise requires"

argument flies in the face of the Legislature's intent in enacting A.R.S. § 42–14401.

¶ 43 Third, Cable One argues we should construe A.R.S § 42–14401 to apply only to telecommunications companies connecting directly to the PSTN because another statute that imposes an excise tax on public service corporations providing "exchange access services" requires this. *See* A.R.S. § 42–5252(B) (2013) (taxing provider's gross proceeds from sales or gross income "from the business of providing exchange access services"); A.R.S. § 42–5251(3) (2013) (defining "[e]xchange access services" as "telephone or telecommunications exchange access lines or channels that provide local access from the premises of a customer to the local telecommunications network to effect the transfer of information"). In making this argument, Cable One also relies on a statement made in the 2008 Tax Handbook issued by the Joint Legislative Budget Committee that this excise tax "does not apply to wireless and VoIP." Staff of Ariz. Joint Leg. Budget Comm., 2008 Tax Handbook, *available at* http://www.azleg.gov/jlbc/08taxbook/08taxbk.pdf (last visited on June 1, 2013).

¶ 44 Although we generally agree that, when faced with an ambiguous statute, a court should attempt to interpret or explain it consistently with other statutes, this principle applies when the other statutes relate to the same subject or same general purpose, and thus are -- to use an old legal Latin maxim -- *in pari materia*. *State ex rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970); *State ex rel. Pennartz v. Olcavage*, 200 Ariz. 582, 587, ¶ 19, 30 P.3d 649, 654 (App.2001). Here, the statutes are not *in pari materia*.

¶ 45 The Legislature enacted A.R.S. § 42–14401 to implement a statutory scheme for central assessment, while it adopted the excise tax statutes to establish a fund to implement and operate emergency telecommunications services or systems using telephone numbers such as 911. 1983 Ariz. Sess. Laws, ch. 316, § 1, 1257 (1st Reg. Sess.) (codifying A.R.S. § 41–702.01, establishing fund to implement and operate "emergency telecommunication services" through political

subdivisions of the state); A.R.S. § 42–5251(2) (defining emergency telecommunication services). Moreover, to apply the *in pari materia* rule, we must be persuaded the intent of the Legislature in enacting A.R.S. § 42–14401 was influenced by its passage of the excise tax statutes. 2B Norman J. Singer and J. D. Shambie Singer, Sutherland Statutes and Statutory Construction § 51.03 (7th ed. 2012). Here, Cable One has provided us with no evidence the Legislature was in any way influenced by the excise tax statutes when it enacted A.R.S § 42–14401. And finally, the wording of the excise tax statute requiring lines and channels to run from the "premises of a customer to the local telecommunications network," A.R.S. § 42–5251(3), is materially different from the wording of A.R.S. § 42–14401.

¶ 46 Fourth, citing a host of federal statutes and FCC orders pertaining to a variety of telecommunications services, including VoIP service, and federal case law interpreting or applying these statutes, Cable One argues classifying it as a telecommunications company under A.R.S. § 42–14401 is contrary to these authorities. We reject this argument. These authorities concern regulation, not taxation.

¶ 47 Although Congress and the FCC have imposed various regulations on VoIP providers and have preempted a variety of efforts by the states to regulate VoIP providers, neither Congress nor the FCC has taken any action to preempt state taxation of VoIP providers. *See generally* Internet Tax Freedom Act Amendments Act of 2007, Pub. L. No. 110–108, 121 Stat. 1024 (excluding voice services utilizing Internet protocol for which there is a charge from moratorium barring state taxes on "Internet access"); *In re Vonage Holdings Corp.*, 19 F.C.C.R. 22404, ¶ 1 (2004) (holding federal law preempts state regulation of VoIP provider, but expressing "no opinion" on applicability of state laws generally governing such companies including "laws concerning taxation"), *aff'd, Minn. Pub. Utils. Comm'n. v. F.C.C.*, 483 F.3d 570 (8th Cir.2007).

■ ¶ 48 Finally, Cable One argues central assessment by the Department violates the Uniformity Clause of the Arizona Consti-

tution requiring all taxes to be uniform upon the same class of property. Ariz. Const. art. 9, § 1. In making this argument, Cable One points out, and the record reflects, the Department does not centrally assess the property of a cable company if it has "[spun] off" the VoIP service to a subsidiary; in that situation it only centrally assesses the subsidiary's property. We reject this argument.

■ ¶ 49 To decide whether a tax classification violates the Uniformity Clause, a court must consider, among other factors, whether the taxpayer (here, Cable One) and the comparison taxpayers (the cable companies that do not offer VoIP service, but own subsidiaries that do) are direct competitors and use the same equipment to provide the same services to the same customer base. *Citizens Telecomm. Co. of White Mountains v. Ariz. Dep't of Revenue*, 206 Ariz. 33, 39, ¶ 24, 75 P.3d 123, 129 (App.2003). Here, as the Department correctly points out, Cable One's property is not functionally equivalent to the property owned by these other cable companies because it is providing VoIP service and these other companies are not.[21]

### CONCLUSION

¶ 50 For the foregoing reasons, we hold Cable One is a telecommunications company under A.R.S. § 42–14401 and therefore subject to central assessment by the Department. We reverse the tax court's judgment in Cable One's favor, deny Cable One's request for attorneys' fees under A.R.S. § 12–348 (Supp.2012) because it did not prevail on appeal, and remand this matter to the tax court for further proceedings consistent with this opinion. As the prevailing party on appeal, we award the Department its costs on appeal pursuant to A.R.S. § 12–341 (2003), contingent upon its compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

CONCURRING: ANDREW W. GOULD, and RANDALL M. HOWE, Judges.

---

21. Cable One presented no evidence in the tax court these subsidiaries were not operating separately and independently from their corporate owners.