NORTHERN MAINE GENERAL HOSPITAL d/b/a CANDO

v.

David RICKER, Code Enforcement Officer, City of Caribou.

Supreme Judicial Court of Maine.

Argued March 7, 1990.

Decided March 29, 1990.

John M. Pluto (orally), Van Buren, for plaintiff.

Mark S. Freme (orally), Caribou, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

Plaintiff Northern Maine General Hospital, d/b/a CANDO (Central Aroostook Network for Disadvantaged Offenders), appeals from an order of the Superior Court (Aroostook County, *Pierson, J.*) affirming a decision of the Caribou Board of Zoning Appeals denying its application for a permit to operate an adult pre-release facility in an R–2 zone. On appeal, plaintiff contends *inter alia* that: 1) a pre-release facility is a permitted use or permitted special exception in an R–2 zone; and 2) the ordinance is facially unconstitutional. We disagree and affirm the judgment of the Superior Court.

The facts are not in dispute. As reported by the Superior Court, they are as follows:

Northern Maine General Hospital (NMGH) is a Maine Corporation, having its primary place of business at Eagle Lake. NMGH, d/b/a Central Aroostook Network for Disadvantaged Offenders (CANDO), has a contract with the State of Maine, Department of Corrections, to operate a six bed community-based corrections program which would serve adult male inmates with seven months or less incarceration remaining. Since August, 1985, NMGH has owned a residence at 37 Fenderson Street, Caribou, which is the proposed site of the CANDO facility.

The 37 Fenderson Street residence was granted a special exception by the Caribou Board of Zoning Appeals (Board) in 1985 for the Aroostook Group Home, a group home for male adolescents. This group home was operated by Diocesan Human Relations Services, Inc., under the name of "Christopher Home" at 37 Fenderson Street until May 17, 1988, when it relocated to 18 Pleasant Street, about one block away and in the same R–2 zoning district. The juvenile home's special exception permitted it to operate a "group home," which term does not specifically appear in the Caribou Zoning Ordinance (ordinance).

On April 26, 1989, NMGH applied to David Ricker, Code Enforcement Officer of the City of Caribou, for permission to operate the CANDO facility at 37 Fenderson Street. Permission was denied. NMGH applied to [the Board] under Section 13–107(17) of [the ordinance]. The Board sent notices to adjoining landowners and published a notice of the hearing in a local newspaper. The hearing was held on May 18, 1989, and a number of Caribou residents attended and were heard. Objections of the residents concerned safety, liability for damages, criminal histories of potential residents, property values and competition for local jobs. [The Board declined to issue the permit].

On June 2, 1989, NMGH appealed the Board's decision to the Superior Court pursuant to M.R.Civ.P. 80B (providing for review of governmental action). The court upheld the Board's decision and NMGH now appeals.

The applicable regulations governing general residence R–2 zones read in relevant part as follows:

B. *Uses Permitted.*

(1) Any use permitted with or without special permission of the Board of Appeals in a R–1 zone and subject to the same restrictions.[1]

(2) Multi-family dwellings

(3) Board houses

The Board of Appeals may permit as special exceptions:

. . . .

(6) Nursing home, hospital, hotel, motel or inn, meeting the requirements of Supplementary Regulations, section 13–104(17).

In denying NMGH's application, the Board held as follows:

The Board of Appeals does not believe a halfway house for convicted felons fits the definition of a multi-family dwelling or a board house in the context intended by the Maine Municipal Association or the Caribou City Council. The Board believes a halfway house for convicted

felons is significantly more objectionable than a home for disadvantaged youths to agree on the similarity of the two programs. The special exception granted to the Christopher House at 37 Fenderson Street terminated on May 17, 1988, when the Christopher House relocated to 18 Pleasant street, and a new special exception was granted. And a halfway house for criminal offenders does not fit the purpose and uses described in the code under Sections 13–101, para. 2., 13–107, para. 17., 13–109, para. 1.B. et seq., and 13–109, para. [2]A., and para. [2]B.(2) and (3).

NMGH first argues that: 1) the CANDO facility is a permitted use as it is either a single or multi-family dwelling, or a boarding house; and 2) in the alternative, it should be granted a special exception permit to run the CANDO facility because it is similar to and no more objectionable than the uses expressly permitted in an R–2 zone.

In addressing these contentions, we note that "[t]he interpretation of provisions in a zoning ordinance is a question of law for the court" and that "[c]ontested language must be construed reasonably and with regard to both the specific object sought and the structure of the ordinance generally." *Ray v. Town of Camden*, 533 A.2d 912, 914 (Me.1987) (citations omitted). Moreover, zoning laws "should be read according to the natural and most obvious import of the language when there is no manifest legislative intent contrariwise." *Moyer v. Board of Zoning Appeals*, 233 A.2d 311, 316 (Me. 1967).

■ Applying these principles of construction to the Caribou ordinance, we conclude that NMGH's argument respecting a single or multi-family dwelling is without merit. The ordinance defines "family" as "[o]ne or more persons occupying a dwelling unit and living as a single housekeeping unit." While this definition departs from ordinary usage in that relationships other than those based on blood or law appear to be contemplated, the concept of "family" suggests "a quality of cohesive-

---

1. R–1 is a low density residence zone established mainly for single-family dwellings.

ness and permanence in the relationship of residents" greater than that which typically exists among inmates at a correctional facility, especially where the average stay of an inmate would be less than seven months. *See Penobscot Area, Etc. v. City of Brewer*, 434 A.2d 14, 23 (Me.1981) (group home for the mentally retarded not a single family residence under Brewer Zoning Ordinance).

Moreover, NMGH has failed to establish that the inmates would live as a single housekeeping unit. The record does not suggest that the inmates would have control over the management and operation of the household. Indeed, NMGH failed to present any evidence to the Board respecting the inmates' responsibilities in the home. Further, its program description described the staffing structure as consisting of six members providing twenty-four hour supervision of the inmates. "[A]s the decisions of other courts suggest, extensive outside aid in the management and operation of a household detracts from the family nature of the home." *Penobscot Area, Etc. v. City of Brewer*, 434 A.2d at 22.

■ NMGH's argument that the CANDO facility should be classified as a boarding house is equally lacking in merit. A boarding house is defined in the ordinance as "[a]ny dwelling in which lodging is offered for compensation to three or more persons either individually or as families with or without meals." First, this language requires a *quid pro quo* whereby lodging is offered for compensation and there is nothing in the record indicating either that the State or the inmates themselves are to pay for their accommodations at the CANDO facility. Second, even if such a showing were made, the ordinance definition, as well as ordinary usage, implies that the provision of lodging for compensation be the primary function and purpose of the establishment and this is clearly not the case with the CANDO facility.

**2.** NMGH also attacks the constitutionality of the ordinance as a whole, arguing that it totally excludes the CANDO facility from the municipality. Because it failed to raise this issue in

■ NMGH next argues that it should be granted a special exception permit to run the CANDO facility because it is similar to and no more objectionable than the uses expressly permitted in an R–2 zone. In support of this contention, it cites from *Your Home, Inc. v. City of Portland*, 432 A.2d 1250 (Me.1981):

> Any use which is similar to and no more objectionable than the uses expressly permitted in a zone, and concerning which there is no explicit provision in the ordinance, may not be arbitrarily and irrationally excluded from that zone, nor excluded on some ground that has no foundation in the ordinance.

*Id.* at 1261. Accepting the argument as presented, we find that the board rationally concluded that the proposed use *is* more objectionable than the permitted uses.

NMGH next argues that §§ 13–101(2) and 13–109(2)(A) are facially unconstitutional because they lack specific standards for granting special exceptions.[2] *See Wakelin v. Town of Yarmouth*, 523 A.2d 575, 577 (Me.1987) (absence of specific standards for granting special exceptions results in a denial of equal protection). Section 13–101(2) is the general purpose provision providing *inter alia* that "[t]he purpose of [the ordinance] is to promote the health, safety, and general welfare of the residents of the City[.]" Section 13–109(2)(A) is the general descriptive provision in the regulations governing R–2 zones, providing *inter alia* that "certain additional uses which meet the requirements of [the ordinance] may be permitted, which contribute to balanced neighborhoods and enhance the attractiveness of the community." This argument is without merit. These provisions do not purport to articulate standards by which the Board is to decide on special exceptions. As the Superior Court justice explained, this is not a case where "a permitted exception was denied due to general public safety, health and welfare considerations; rather it is one of zoning interpretations[.]" *See Fitan-*

the Superior Court, it has not been preserved for appeal. *Valente v. City of Westbrook*, 543 A.2d 1373, 1375 n. 1 (Me.1988).

*ides v. Crowley,* 467 A.2d 168, 172 (Me. 1983) (pointing out in dicta that the denial of a permitted exception due to unspecified public safety, health and welfare considerations would be unconstitutional).

NMGH next argues that the Board was required to grant its request for a special exception because by its issuance of a special exception permit for the Christopher House the Board had established that a group home is one of the permitted special exceptions for an R–2 zone. This argument is without merit. NMGH has failed to cite any authority for the proposition that a Board's interpretation of an ordinance in a given instance carries precedential value, and we are unaware of any.

 NMGH's final argument is that pursuant to 30–A M.R.S.A. § 4352(6) (Supp. 1989) the ordinance is only advisory with respect to the CANDO facility and that therefore it should be exempt from the Caribou ordinance. Section 4352(6) provides that "[a]ny zoning ordinance is advisory with respect to the State." In *Penobscot Area, Etc v. City of Brewer,* 434 A.2d 14 (Me.1981), we construed this provision in reviewing the denial by the City of Brewer's Zoning Board of Appeals of a nonprofit corporation's application for an occupancy permit to operate a group home for the mentally retarded. Rejecting that corporation's argument that it should be exempt from Brewer's ordinance, we explained:

> Although we are sensitive to the difficulties faced by organizations like this Corporation in finding appropriate locations for group homes, we do not read [this provision] as authorizing unrestricted suspension of legitimate zoning regulations for nonprofit corporations serving state interests absent a showing of compelling need, and unless existing, as well as continuing, state involvement of a substantial nature has been established by the party claiming the exemption.

*Id.* at 20. NMGH contends that there is both a compelling need for and continuing state involvement respecting the CANDO facility, and that as a result it should be exempt from the Caribou ordinance.

This argument is without merit. First, because the record reveals no mention at all of § 4352(6) and "this Court and the Superior Court generally will not review issues not litigated before the Board," this issue has not been preserved for appeal. *Id.* n. 7. Second, NMGH has failed to make the requisite showing of long-term State involvement. While representatives of the corporation testified that it had a contract with the State, neither documentation of nor testimony as to its substance appears in the record. *Id.* n. 6.

The entry is: Judgment affirmed.

All concurring.