799 P.2d 908

**WELLS FARGO CREDIT CORPORATION, a California corporation, Plaintiff–Appellant,**

v.

**ARIZONA PROPERTY AND CASUALTY INSURANCE GUARANTY FUND, Defendant–Appellee.**

No. 1 CA–CV 89–013.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 11, 1990.

Lewis and Roca by Susan M. Freeman and Mary R. Crawford, Phoenix, for plaintiff-appellant.

Charles J. Surrano, III, Phoenix, for defendant-appellee.

## OPINION

JACOBSON, Presiding Judge.

In this appeal from summary judgment, we (1) interpret A.R.S. § 20–680, which exempts the Arizona Property and Casualty Insurance Guaranty Fund (Fund) from liability for claims made against an insolvent insurer, and (2) determine whether the Fund is immune from tort liability.

## FACTUAL BACKGROUND

Appellant Wells Fargo Credit Corporation (Wells Fargo), among other things, conducted an automobile leasing business in Arizona. In connection therewith, Wells Fargo obtained from Integrity Insurance Company (Integrity) what Integrity called "residual value insurance." This insurance provided that, when Wells Fargo's leases matured, Integrity, at its option, would ei-

ther purchase the previously leased automobiles for the adjusted residual value, as defined by the policy, or pay Wells Fargo the difference between this value and the amount for which Wells Fargo could sell the cars. In essence, this insurance guaranteed that Wells Fargo would receive a fixed value for its leased autos at the termination of the lease.

Integrity's policy insuring against this type of risk was approved by the Department of Insurance (Department) in 1981. The Department categorized this residual value insurance as "miscellaneous" casualty insurance. See A.R.S. § 20–252(11).

Integrity was declared insolvent in April 1987. At that time, Wells Fargo held claims against Integrity in the sum of $262,259.00 for amounts due under the policy. Wells Fargo made demand upon the Fund for this amount[1] and ultimately brought suit for its recovery. In addition, Wells Fargo brought claims for bad faith and misrepresentation against the Fund. All three claims were decided in the Fund's favor by summary judgment, and Wells Fargo appealed.

## EXCLUSION FROM FUND COVERAGE

The Fund was created by the legislature to provide for the payment of claims under certain insurance policies to avoid excess delay in payment and financial loss to claimants or policyholders because of the insolvency of an insurer. See generally Laws 1977, ch. 130. The statute defining the Fund's guaranty protection for insolvent insurers provides that the Fund applies:

to all *kinds of insurance* except life, title, surety, disability, credit, mortgage guarantee, workers' compensation and ocean-marine insurance. *This article shall not cover any new types of coverage approved or permitted after August 27, 1977.*

A.R.S. § 20–680 (emphasis added).

Wells Fargo essentially argues that the exemption provided by the statute applies

1. Wells Fargo's original demand was in the amount of $256,796.00; Wells Fargo amended

this demand after further investigation to $262,-259.00.

only to kinds of insurance approved or permitted by the legislature after August 27, 1977. Because residual value insurance is a type of casualty insurance and because casualty insurance is a kind of insurance approved or permitted by the legislature prior to 1977, Wells Fargo argues, residual value insurance does not fall within any § 20–680 exceptions. In support of its argument, Wells Fargo relies primarily on its contention that there did not exist, at the time § 20–680 was enacted, any statutory authorization for the Department, as compared to the legislature, to approve or permit new types of coverages, and, consequently, the Department itself has not established an administrative mechanism through which a type of coverage can be approved.

On the other hand, the Fund argues that the Department is authorized by the legislature to "approve or permit" new types of coverages, and that it did not do so with regard to residual value insurance until sometime after 1977. Therefore, the Fund argues, such insurance is exempt from Fund coverage under the clear language of § 20–680.

■ When construing a statute, we must ascertain and give effect to the legislative intent behind the statute. *State v. Cereceres*, 166 Ariz. 14, 15, 800 P.2d 1, 2 (App.1990). To do so, we examine the language used, the context, the subject matter, the effect and consequences, and the spirit and purpose of the law. *Id.* Because we disagree that the language of § 20–680 is clear and unambiguous, *see State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 592, 667 P.2d 1304, 1307 (1983), we briefly review the statutory scheme relating to the Department's approval authority.

In order to do business in Arizona, an insurer must first comply with certain statutory financial and other qualification requirements. *See generally* A.R.S. § 20–206, *et seq.* Once qualified by the Department, "[a]n insurer ... may be authorized to transact any one kind or combination of kinds of insurance as defined in [A.R.S. § 20–251, *et seq.*]" A.R.S. § 20–209. After it authorizes an insurer to transact a particular *kind* of insurance, the Department's statutory authorization primarily extends to approval of policy forms and rates. *See* A.R.S. §§ 20–398(A) and 20–388.

The process by which Integrity was "authorized" to issue its residual value insurance policy to Wells Fargo is illustrative of this statutory scheme. After qualification, Integrity was authorized by the Department to transact casualty insurance, excluding workers' compensation insurance, but including "miscellaneous" casualty insurance, which is defined as:

> insurance against any other kind of loss, damage or liability properly a subject of insurance and not within any other kind of insurance as defined in this title....

A.R.S. § 20–252(11). It then subsequently submitted to the Department its policy and rates pertaining to residual value insurance. The Department classified the insurance as "miscellaneous casualty," and conducted a review to determine whether the policy and rates complied with all relevant statutes.

It is against this statutory framework that we examine A.R.S. § 20–680. As previously indicated, § 20–680 exempts the Fund from liability for certain *kinds* of *insurance* and also for "any new *types* of *coverages* approved or permitted after August 27, 1977." (Emphasis added.) The August 27, 1977 date relates to the effective date of the legislation establishing the Fund. *See* Laws 1977, ch. 130, § 2. However, it is less clear what the legislature meant by the term "new types of coverages," particularly in light of the first sentence of the statute exempting specific "kinds of insurance." The Fund contends that "types of coverages" refers to insurable "risks" that were not covered by insurance prior to 1977. Because residual value insurance covering the risk of depreciating automobiles in the auto leasing business was not issued by Integrity until 1981,[2] the Fund argues, this "type of coverage" is therefore excluded by § 20–680.

---

2. With some justification, Wells Fargo contends that the Fund's factual assertion that residual

We disagree. Even if "coverages" and "risks" are conceptually interchangeable, the Fund's argument fails to account for the legislature's failure to enact a procedure authorizing anyone to "approve or permit" either "coverage" or "risk." Section 20–252(11), authorizing the Department to disapprove insurance that is "contrary to law or public policy," is specific to miscellaneous casualty insurance; it does not give approval authority for "new types of coverages" that do not come within this subcategory of casualty insurance.

In this regard, however, the Fund argues, without authority, that miscellaneous casualty insurance will by definition be a "new type of coverage" because, if a type of coverage were able to be classified under another insurance category, it would *ipso facto* not be "new." Again, we disagree. It is conceivable, for example, that a malpractice insurer in 1990 could decide, for whatever reason, to issue insurance against the risk of cosmetologist malpractice—a risk that, for the sake of argument, was not covered in the industry prior to August 27, 1977.[3] This coverage would thus undoubtedly be "new," and yet it clearly would be properly classified as "malpractice insurance" under § 20–252(9), not "miscellaneous casualty" under § 20–252(11). The above hypothetical also illustrates from a practical standpoint the inequities that result from equating "coverage" with "risk" in terms of § 20–680. The insurance industry obviously issued medical and legal malpractice insurance prior to August 27, 1977. We do not believe that the legislature intended by excluding from Fund coverage "new types of coverages approved or permitted after August 27, 1977" that claimants against the insured attorneys and doctors would have access to the Fund in the event of the insurer's subsequent insolvency, but claimants against the insured cosmetologists would not.

■ In the end, the flaw in the Fund's argument is simple. Section 20–680 excludes from Fund coverage "new types of coverages approved or permitted after August 27, 1977." However, the Fund fails to cite to any statute, applicable to all kinds of insurance generally, that authorizes the Department to approve or permit "new types of coverages." We believe that, if the legislature intended to exempt from Fund coverage those "types of coverages" not "approved or permitted" by the Department prior to 1977, it would have concomitantly authorized the Department to do just that.

Given our rejection of the Fund's position and in order to give the second exemption in § 20–680 any meaning at all, we believe that the approval or permission required therein refers to that given by the legislature. If the "type of coverage" for which Fund coverage is sought is a "kind of insurance" authorized by the legislature prior to August 27, 1977,[4] the "type of coverage" is not exempt from Fund coverage by the second sentence of § 20–680. In this case, Integrity was authorized to issue miscellaneous casualty insurance—a category of insurance that encompassed residual value insurance. Because miscellaneous casualty insurance was a kind of insurance permitted to be issued prior to August 27, 1977, the Fund is liable for claims made by Integrity's policyholders, including Wells Fargo.

## FUND IMMUNITY FROM TORT LIABILITY

As noted above, the trial court also granted summary judgment in favor of the Fund on Wells Fargo's claims of bad faith and misrepresentation. The court found

value insurance did not exist until 1981, when Integrity sought form and rate approval, is not supported by the record. However, we need not address this factual argument because of our resolution of the type of coverage issue.

**3.** Coverage of this type of risk may well have been offered by insurers prior to August 1977. We merely use this example to illustrate a point.

**4.** We note that the legislature in fact authorized a "new kind of insurance" after 1977. *See* A.R.S. § 20–1097.02 (prepaid legal insurance), added by Laws 1983, ch. 227, § 2 (eff. July 27, 1983).

that the Fund was immune from tort liability under A.R.S. § 20–675(A), which provides:

> There shall be no liability on the part of, and no cause of action shall rise against, any member insurer, the board or its agents or employees, the director or representatives of the director for any action taken in the performance of their powers and duties pursuant to this article.

On appeal, Wells Fargo essentially argues that § 20–675 grants immunity only to various individuals involved with the Fund and to its member insurers, not to the Fund itself. In support of this argument, Wells Fargo points to § 20–693, the immunity provision in the article establishing the life and disability insurance guaranty fund. Section 20–693 provides:

> There shall be no liability on the part of and no cause of action of any nature shall arise against *the fund* or its agents or employees, members of the board of directors or the director or his or her representatives for any action taken by them in the performance of their powers and duties pursuant to this article.

(Emphasis added.) Wells Fargo argues that the inclusion of "the fund" in the list of immune persons and entities in § 20–693 evidences the legislature's intent to protect the life and disability guaranty fund from tort liability, and that the exclusion of "the fund" in § 20–675 evidences the legislature's contrary intent with regard to the Fund involved here.

 Initially, we note that legislative expression in a statute of items of a class indicates an intent to exclude items of the same class not expressed. *Arizona Bd. of Regents v. State ex rel. State Public Safety Retirement Fund Manager Adm'r*, 160 Ariz. 150, 157, 771 P.2d 880, 887 (App. 1989). However, this principle of statutory construction is not definitive and does not override our obligation to construe a provi-

sion of a statute in the context of related provisions and in light of its place in the statutory scheme. *City of Phoenix v. Superior Court*, 144 Ariz. 172, 176, 696 P.2d 724, 728 (App.1985). *See also Wilson v. Industrial Comm'n*, 147 Ariz. 261, 265, 709 P.2d 895, 899 (App.1985) (statutory provisions are to be construed in harmony with each other). In so doing, we will avoid an interpretation that leads to an absurd result that could not have been contemplated by the legislature. *City of Phoenix*, 144 Ariz. at 177, 696 P.2d at 729.

In this regard, we acknowledge that the legislature omitted the term "the fund" from § 20–675 and included it in § 20–693. However, Wells Fargo has failed to point to (and we have been unable to find) any rational basis for the legislature to immunize from tort liability one but not both guaranty funds, which, so far as we have been able to discern, operate virtually identically.[5] Therefore, in order to ascertain the legislative intent behind § 20–675, we turn to an analysis of its place in the framework of the entire Fund legislation.

A.R.S. § 20–667(A) provides that the Fund is obligated "to the extent of the covered claims" existing during specific periods. A "covered claim" is defined as:

> an unpaid claim, including one for unearned premium, which *arises out of and is within the coverage of an insurance policy* to which this article applies....

A.R.S. § 20–661(3) (emphasis added). However, this obligation is limited by § 20–667(B), which provides:

> Such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars and is less than one hundred thousand dollars.... In no event shall the fund be obligated to a policyholder or claimant in any amount in excess of the face amount of the policy from which the claim arises.

---

5. The Fund attempts to draw a distinction between the two guaranty funds by arguing that the life and disability guaranty fund is made of member insurers for whom membership is not voluntary, *see* A.R.S. § 20–683(A), and therefore it is necessary that that fund be specifically granted immunity by inclusion of such language in § 20–693. However, as Wells Fargo correctly points out, the Fund here is also made up of member insurers for whom membership is not voluntary. *See* A.R.S. §§ 20–661(6) and 20–666(A).

To the extent of its obligation on the covered claims, the Fund is "deemed the insurer," with "all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent." A.R.S. § 20–667(C).

Just as the legislature limited the Fund's obligation to the extent of the "covered claims," so too it limited the Fund's authority to collect funds to pay covered claims. All costs, expenses, and liabilities of the Fund must be paid by the Fund and are not a general obligation of the state. A.R.S. § 20–662(C). In this regard, § 20–666(A) provides:

> The [guaranty fund] board shall assess each member insurer, as a condition of such insurer's authority to transact insurance in this state, *in such amounts as are necessary to pay the obligations of the fund pursuant to § 20–667* subsequent to an insolvency, the expenses of handling covered claims subsequent to an insolvency, the cost of examinations and other expenses authorized pursuant to this article.

(Emphasis added.) If assets of the Fund at the end of a calendar year exceed the liabilities as estimated for the coming year, the guaranty fund board may refund such excess amount to each member insurer, in proportion to its contribution. A.R.S. § 20–666(G).

■ The Fund is thus statutorily limited to the payment of "covered claims," the definition of which does not include tort claims made against the Fund. Moreover, the Fund (through its board) is also statutorily unable to collect funds from member insurers beyond that necessary to pay "covered claims." In sum, the legislature neither provided for the Fund to obtain money to discharge an adverse tort judgment nor authorized the Fund to actually pay such a judgment against it were one to be rendered.

Our analysis of this issue is supported by a similar analysis of the California Supreme Court in *Isaacson v. California Insurance Guarantee Association,* 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297 (1988). Although not entirely analogous because the California definition of "covered claims" expressly excluded judgments "resulting from alleged or proven torts," and because the California immunity provision expressly included "[t]he association," [6] we believe that the reasoning in *Isaacson* is sound. The *Isaacson* court found that California's overall statutory scheme, without specific reliance on either of the statutory provisions noted above, indicated a legislative intent that the California guarantee fund (CIGA) be immune from liability for the plaintiffs' tort claims. *Id.* at 784–85, 244 Cal.Rptr. at 661–62, 750 P.2d at 303. The *Isaacson* court then noted an additional factor that supported its conclusion:

> [T]he protective function served by [the California Unfair Practices Act] is less necessary with CIGA than with an ordinary insurer. Because CIGA is not a private, profit oriented enterprise, it does not gain financially by refusing to defend or settle claims. It therefore lacks economic incentive to deal unfairly with insureds. Essentially, CIGA provides an added benefit to insureds; without CIGA, once an insurer became insolvent, its insureds would be deprived of any benefits or indemnification for claims that would have been covered under the policy of the insolvent insurer.

*Id.* at 787, 244 Cal.Rptr. at 663–64, 750 P.2d at 305.

Such analysis applies with equal force in this case. The Fund is a statutorily created source of funds intended to alleviate the economic impact to claimants and policyholders covered by insolvent insurers. Member insurers are assessed only amounts necessary to allow the Fund to meet its obligations to pay "covered claims." Even if the Fund were authorized to pay a judgment against it beyond the scope of a "covered claim," it is the member insurers, not the Fund, who would feel the direct and sole economic impact.

---

6. *See* former Cal.Ins.Code Ann. §§ 1063.2(f) and 1063.12(a) (West); *Isaacson,* 44 Cal.3d at 784, 244 Cal.Rptr. at 661–62, 750 P.2d at 303.

In sum, we find that the legislative intent and the relevant statutory provisions indicate that the Fund itself is immune from tort liability pursuant to § 20–675, notwithstanding the lack of a specific reference to the Fund in that provision.

### CONCLUSION

Because we hold that residual value insurance is not exempted from Fund coverage under § 20–680, we reverse and remand that portion of the trial court's judgment for proceedings consistent with this opinion. We affirm that portion of the judgment that held the Fund was immune from tort liability under § 20–675.

GRANT, C.J., and LANKFORD, J., concur.