IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MARICOPA COUNTY, *Plaintiff/Appellee*,

*v.*

TARIQ M. RANA, et al., *Defendants/Appellants*.

No. 1 CA-CV 18-0256
FILED 2-25-2020

Appeal from the Superior Court in Maricopa County
No.  CV 2017-012602
The Honorable Randall H. Warner, Judge

**VACATED AND REMANDED**

COUNSEL

Scharff PLC, Phoenix
By Spencer G. Scharff
*Counsel for Defendants/Appellants*

Maricopa County Attorney's Office, Civil Services Div., Phoenix
By Wayne J. Peck, Joseph Branco, D. Chad McBride
*Counsel for Plaintiff/Appellee*

Arizona Center for Disability Law, Tucson
By Rose A. Daly-Rooney, Maya S. Abela
*Counsel for Amicus Curiae*

---

## OPINION

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Diane M. Johnsen and Judge Jennifer M. Perkins joined.

---

**B R O W N**, Judge:

¶1        Tariq M. and Shahnaza Rana ("Ranas"), and their lessee, Ascend Behavioral Health and Wellness, LLC ("Ascend"),[1] appeal the superior court's judgment granting Maricopa County's request to permanently enjoin alleged violations of the County's zoning ordinance ("MCZO") relating to group homes.  The Ranas argue their group home does not violate the MCZO.  They raise other issues that we address in a separate memorandum decision.  For the following reasons, we vacate the judgment and remand for further proceedings.

## BACKGROUND

¶2        The Ranas own a nine-bedroom house located on 1.25 acres in an unincorporated area of the County where group homes are an as-of-right use.[2]  The applicable zoning regulations limit such homes to no more than ten residents and provide that if licensing is required by the State of Arizona, proof of such licensure must be provided before the use is established.  MCZO §§ 201, 501.2(4), 503.2.  The MCZO defines a "group home" as follows:

> A dwelling unit shared as their primary residence by minors, handicapped or elderly persons, living together as a single housekeeping unit, in a long term, family-like environment in which staff persons provide on-site care, training, or support for the residents.  Such homes or services provided therein shall be licensed by, certified by, approved by, registered with, funded by or through, or under contract with the State.

---

[1]        For ease of reference, we refer to the Ranas and Ascend collectively as "the Ranas," unless otherwise noted.

[2]        Absent material revisions after the relevant date, we cite the current version of a statute, ordinance, or administrative rule.

(Group homes shall not include homes for the developmentally disabled, defined as persons afflicted with autism, cerebral palsy, epilepsy or mental retardation, as regulated by Arizona Revised Statutes, § 36-582.)

MCZO § 201.

¶3        In 2014, the Ranas submitted an application to the County for approval to use the house as an assisted living group home ("the Home") for the elderly.  After administrative review, the County issued a "zoning clearance," which is "a permit or authorization . . . indicating that a proposed building, structure or use of land meets all the standards contained in this ordinance." MCZO § 201.  The zoning clearance stated that before the Ranas could begin operating the group home, they were required to submit a copy of their "State of Arizona license."

¶4        The Ranas then leased the Home to Ascend, which in turn obtained a license from the Arizona Department of Health Services in May 2016 to operate a "behavioral health residential facility," defined by state regulations as a "health care institution that provides treatment to an individual experiencing a behavioral health issue" that "[l]imits the individual's ability to be independent" or "[c]auses the individual to require treatment to maintain or enhance independence."  *See* A.A.C. R9-10-101(36); *see also* A.R.S. § 36-407(A).[3]

¶5        In January 2017, the County issued a "Notice and Order to Comply," alleging the Ranas were operating "a group home for adjudicated persons or a drug rehabilitation home without a special use permit" in violation of the MCZO.  Several months later, the Ranas entered into a compliance agreement with the County that stated they had violated the MCZO by operating "a group care facility for a variety of patient residents" where the approved permit "only permits care for the elderly."[4]  The Ranas

---

[3]        Under a regulation issued by the Arizona Department of Health Services, "'[b]ehavioral health services' means the assessment, diagnosis, or treatment of an individual's mental, emotional, psychiatric, psychological, psychosocial, or substance abuse issues." A.A.C.  R9-1-301(1).

[4]        The term "group care facility" was added to the MCZO in May 2017 as a catch-all term to refer to any "dwelling unit shared as their primary residence by any class of patient residents under supervised care who do not qualify as a group home." MCZO § 201.  This amendment changed only the label, not the substance, of the Ranas' alleged zoning violations.

agreed to stop "all supervised care . . . for other than up to ten (10) elderly patient residents and to use the Home in accordance with pertinent zoning regulations."

**¶6**　　　　Around the same time, the Ranas sought approval to use the Home to provide group care for six to ten disabled residents. The County approved the application but required Ascend to submit a "State of Arizona license" to the County before commencing operation as a group home for disabled individuals. The County's approval was also subject to the earlier compliance agreement, including the requirement that "[Ascend] maintain a log of the number of patient residents indicating each age and condition," as well as "vehicles on site by license plate and drivers, who must be either a caregiver, family, or visitor of a caregiver or patient resident." Ascend was also required to ensure that residents would be long-term, meaning they would live in the Home for at least one year.

**¶7**　　　　After an inspection, the County informed the Ranas they were not complying with the second zoning approval and were again violating the MCZO. The County then filed suit under A.R.S. § 11-815(H), which allows a county attorney to seek an injunction to "prevent, abate or remove" any use or proposed use of land that violates a zoning ordinance.

**¶8**　　　　The superior court held a trial on the County's request for a permanent injunction, hearing testimony from Ascend's executive director and Carol Johnson, the County's Planning and Development Director. The court ruled in the County's favor, finding that based on the totality of circumstances, the residents of the Home did not live in a "family-like environment," in part because Ascend was operating the Home too much like a traditional in-patient treatment facility. The court also found that in the absence of a special use permit, the MCZO does not allow "a facility whose main purpose is to provide treatment to residents" because the word "treatment" is not included in the MCZO's group home definition.

**¶9**　　　　After entry of a final judgment outlining the general terms of the permanent injunction, the Ranas timely appealed. The superior court stayed the injunction pending appeal, subject to several conditions, including the prohibition of (1) any on-site staff meetings for employees other than those working at the Home and (2) any non-emergency "in-home treatment," which the court "defined as any physical, psychological, or mental health treatment or therapy from any licensed professional."

**DISCUSSION**

**¶10**        Reviewing a permanent injunction, we accept the superior court's factual findings unless they are clearly erroneous, *Nordstrom, Inc. v. Maricopa Cty.*, 207 Ariz. 553, 558, ¶ 18 (App. 2004), but review its legal conclusions de novo, *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 178, ¶ 5 (App. 2008).

**¶11**        The normal rules of statutory construction generally apply to zoning ordinances. *See Ariz. Found. for Neurology & Psychiatry v. Sienerth*, 13 Ariz. App. 472, 475 (1970). Unless the context suggests otherwise, we give undefined words their common meaning, often drawing on authoritative dictionaries to do so. *Stout v. Taylor*, 233 Ariz. 275, 278, ¶ 12 (App. 2013). We apply unambiguous text without further inquiry. *State v. Burbey*, 243 Ariz. 145, 147, ¶ 7 (2017). But if conflicting reasonable interpretations exist after examining the text, context, and related laws, *Glazer v. State*, 244 Ariz. 612, 614, ¶ 12 (2018), we may use secondary tools, such as the law's subject matter, historical background, and purposes, *Burbey*, 243 Ariz. at 147, ¶ 7. We must also recognize that because zoning ordinances "exist in derogation of property rights," they will be strictly construed in favor of the property owner. *Kubby v. Hammond*, 68 Ariz. 17, 22 (1948); *County of Cochise v. Faria*, 221 Ariz. 619, 623, ¶ 10 (App. 2009).

### A.        "Family-Like Environment"

**¶12**        As noted above, the ordinance defines a "group home" as a "dwelling unit shared as [a] primary residence by minors, handicapped or elderly persons, living together as a single housekeeping unit, in a long term, *family-like environment* in which staff persons provide on-site care, training, or support for the residents." MCZO § 201 (emphasis added). The superior court found that Ascend did not maintain a "family-like environment" in the Home, but instead, treated it "largely as a treatment facility that just happens to be in a neighborhood." The court noted that Ascend held staff meetings at the Home for employees of other group homes and transported residents of other Ascend group homes there for group events and to receive care. The court also pointed to rules Ascend imposed on residents of the Home, which it found "significantly regulate the lives of residents and restrict their freedom."

**¶13**        The Ranas argue that a "family-like environment" necessarily contemplates something similar to, but broader than, the meaning of the word "family." *See generally -like*, American Heritage Dictionary (5th ed. 2011) ("Resembling or characteristic of . . . ."). Without denying that Ascend

5

sometimes used the Home for staff meetings or to provide events or care for residents of its other facilities, the Ranas argue that Ascend nevertheless maintained a "family-like" atmosphere for the several residents of the Home. Although it offers no analysis of the text of the ordinance, and relies almost entirely on Johnson's testimony, the County argues substantial evidence supports the superior court's conclusion that Ascend conducted activities at the Home in ways that went beyond a "family-like environment."

¶14 We must first consider whether the MCZO itself includes any provisions that guide our understanding of the group home definition. The MCZO does not define "family-like environment," but does define "family" to include "a group of not more than five (5) persons, who need not be related, living together as a single housekeeping unit in a dwelling unit." MCZO § 201. This definition, however, simply replicates a requirement already present in the group home definition—that residents live in a "single housekeeping unit," and thus it sheds little light on what the MCZO might mean by the phrase "family-like environment." Further, the definition does not apply to zoning clearances issued for more than five people, like the situation here, making its application even more narrow. We therefore turn to the common meaning of "family-like environment," and, given the relative scarcity of authorities defining the term, we begin by considering authorities defining the word "family" to inform our understanding of the broader phrase.[5]

---

[5] The County does not dispute that all of the residents considered the Home as their primary residence, intended to stay there long term, and fell within the ordinance's definition of handicapped (each was diagnosed as seriously mentally ill). *See* MCZO § 201 ("Handicapped" refers to "[a] person who: 1) has a physical or mental impairment which substantially limits one or more of such person's major life activities; [and] 2) has a record of having impairment."). And neither side makes any meaningful argument that the term "single housekeeping unit" informs the definition of a "family-like environment" or otherwise affects whether the Home was operated in violation of the MCZO. The County relies on Johnson, who testified that a single housekeeping unit would "mirror[]" a "family-like environment," "so there are shared chores, and responsibilities for the maintenance and upkeep . . . of the home [and] there is free association." Because these factors are generally included among those we analyze to discern the meaning of "family-like environment," we do not separately address the phrase "single housekeeping unit."

¶15 In various other contexts the word "family" has been defined as "a group of individuals living under one roof and usually under one head." *See, e.g., Heard v. Farmers Ins. Exchange Co.*, 17 Ariz. App. 193, 196 (1972); *Brown v. Stogsdill*, 140 Ariz. 485, 487 (App. 1984) (same); *Family*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014) (same). Other definitions reveal a more restrictive meaning. *See Family*, The American Heritage Dictionary (5th ed. 2011) ("A fundamental social group in society typically consisting of one or two parents and their children."); *Family*, Black's Law Dictionary (10th ed. 2014) ("A group of persons connected by blood, by affinity, or by law, esp. within two or three generations."); *cf. Moore v. City of East Cleveland*, 431 U.S. 494 (1997) (construing, but striking as unconstitutional, a zoning ordinance attempting to limit the definition of "family" to, in essence, parents and their children). Dictionaries broadly define "environment" as a "[g]eneral set of conditions or circumstances." *See, e.g., Environment*, The American Heritage Dictionary (5th ed. 2011).

¶16 Definitions considered in isolation, however, are of little aid in interpreting the term "family-like environment" absent an understanding of what group homes are and how zoning ordinances typically regulate them. *See Adams v. Comm'n on Appellate Court Appointments*, 227 Ariz. 128, 135, ¶ 34 (2011) (explaining that a word's meaning cannot be determined in isolation but must be drawn from its context). As late as the mid-1970's, the concept of a group home was relatively new. *City of White Plains v. Ferraioli*, 313 N.E.2d 756, 757 (N.Y. 1974). Before that time, for example, communities often sought to exclude mentally ill and other disabled persons by housing them in institutions. *See City of Livonia v. Dep't of Soc. Servs.*, 378 N.W.2d 402, 408 (Mich. 1985) (rationale was to "protect[] society from these persons"). More recently, authorities came to believe that institutionalization as a one-size-fits-all approach was inadequate and sometimes cruel, giving rise to a movement to allow "disabled persons who are unable to live with their families . . . to reside in homes of normal size, located in normal neighborhoods, that provide opportunities for normal societal integration and interaction," to assist "disabled persons to reach their full potential and become contributing, productive members of society." *Id.* at 408–09. Thus, group homes now "attempt to prepare their members for independent and productive lives in the community." Arden H. Rathkopf et al., 2 Rathkopf's The Law of Zoning and Planning § 23:24 (4th ed. 2018).

¶17 Despite these goals, local zoning authorities and neighboring landowners often challenge the establishment of group homes by arguing the residents are not a "family" within the meaning of a zoning ordinance or a restrictive covenant. *Id.* at §§ 23:15, 23:24, 23:27. In these cases, when

ordinances do not define "family," as is true of the phrase "family-like environment" in the MCZO, courts have generally concluded the word "family" includes "so-called 'functional-families' of persons living together as a relatively stable and bona fide single-housekeeping unit." *Id.* at § 23:9. Courts applying this "functional family" standard are likely to consider such factors as "whether the household is relatively stable, possess[es] a family-like structure of household authority, functions as an integrated economic unit, evidences some family-like domestic bond between members, and has the potential to impact negatively the family character of the residential area." *Id.* at 23:15. Though some courts "liberally interpret[] the standard to include any group home where the residents bear the generic character of a relatively permanent functional family unit," others take a more restrictive view, concluding that "the particular operating characteristics of a group home" may carry it beyond a "functional family." *See id.* at § 23:27 & n.11.

¶18    We conclude that the functional family standard, under the more restrictive view described above, provides the most reasonable meaning that can be ascribed to the phrase "family-like environment" in the MCZO. This is in line with the decisions of other courts and is consistent with the historical background and purpose of group homes generally. *Id.* at § 23:27. This standard also remains faithful to the text of the MCZO by ensuring that the requirement of a "family-like environment" remains meaningful—the ordinance must contemplate some reasonable boundaries on what it allows. At the same time, business activities unrelated to the goal of readying that particular home's residents for independence may disrupt the residential character of the neighborhood and violate the MCZO.

¶19    Applying the functional family standard here, various aspects of the way Ascend runs the Home support the conclusion that its residents live in a "family-like environment." For example, each resident has a separate bedroom and exercises some degree of control over that space, shares access and upkeep responsibilities for certain common areas with others, and exercises some limited input on what chores he or she is assigned. These are factors other courts have cited in similar inquiries. *See, e.g., City of W. Monroe v. Ouchita Ass'n*, 402 So.2d 259, 261, 265 (La. Ct. App. 1981) (people with "common interests, common goals, common problems, and . . . receiving some supervisory attention" who all eat and sleep in the same home are considered a "one-family dwelling"); *Costley v. Caromin House, Inc.*, 313 N.W.2d 21, 23, 26 (Minn. 1981) (people with mental disabilities who live as a family and share all parts of the house except their individual bedrooms and who share family functions such as planning

outings and performing household duties constitute a "single-family dwelling"); *Jackson v. Williams*, 714 P.2d 1017, 1024 (Ok. 1985) (a group home for five mentally handicapped persons and a housekeeper is a "single-family unit" within the meaning of the zoning ordinance).

**¶20**　　　Staff members are on-site 24 hours a day at the Home, but do not sleep there. They serve on a rotating basis, and — at least generally — do not provide on-site medical treatment to residents. *See City of Livonia*, 378 N.W.2d at 431–32. Residents also engage in recreational activities, both at the Home and in the community at large. *See Albert v. Zoning Hearing Bd.*, 854 A.2d 401, 447 (Pa. 2004) (reasoning that individuals who engaged in group activities, including attending "social and religious functions together and celebrat[ing] holidays jointly," functioned as a "caring familial unit") (citation omitted); *see also Ferraioli*, 313 N.E.2d at 758 ("[T]he intention is that they remain and *develop ties to the community*.") (emphasis added). Finally, residents have no fixed duration of stay, the ultimate goal of which is to help them learn skills that will enable them to live in a more independent manner.

**¶21**　　　At the time of trial, not all of Ascend's practices were consistent with the concept of a functional family. The superior court heard evidence that Ascend used the group home for business purposes in a way that was not reasonably tied to serving the residents' needs and could "impact . . . negatively the residential character of the neighborhood." Rathkopf et al., at § 23:27; *cf. City of Livonia*, 378 N.W.2d at 431 (finding that increased traffic and parking problems did not transform the nature of a group home from residential to commercial). On one occasion, County inspectors saw 25 cars parked outside the Home and observed a staff meeting that included employees from other facilities. These meetings were taking place on a biweekly basis at the Home until Ascend moved them to a different location. Such meetings, and the traffic problems they can cause, are different in kind from "a large traditional family with several cars and numerous visitors." *See Id.* at 431.

**¶22**　　　Similarly, Ascend sometimes used the Home to host activities for residents of its other facilities — who might be complete strangers to the Home's residents and who might require Ascend's services for different reasons. Given that the stability and cohesion of the household is a critical feature of the functional family that group homes try to create, *see generally N. Me. Gen. Hosp. v. Ricker*, 572 A.2d 479, 481–82 (Me. 1990), we conclude that Ascend's practice of bringing residents from its other facilities to the Home for activities and care was inconsistent with the MCZO's requirement of a "family-like environment." We therefore agree with the

superior court's decision to enjoin these two practices, which stretch beyond the concept of a "family-like environment."

¶23        We disagree, however, with the superior court's conclusion that the rules posted in the Ascend group home are "more indicative of an in-patient treatment facility than a family-like environment" because they "so significantly regulate the lives of the residents and restrict their freedom."[6]  We agree that the rules Ascend imposes on residents include significant limitations on how residents may conduct their lives in the Home, but as the court also acknowledged, "there is nothing wrong with such rules in a facility whose goal is to treat serious mental illness and to help residents move toward independence."  That goal, however, would traditionally militate in favor of a "family-like environment." *See* Rathkopf et al., at § 23:24 (noting mental health professionals have found that "family-like residences . . . offer greater rehabilitative potential" than large institutions and can benefit society by preparing residents of such homes to live independently).  And rules are part and parcel of any family home.

¶24        We also recognize that group home residents are individuals, and the purpose of their stay is to address their individual needs.  Whether a home serves "minors, handicapped, or elderly persons," as the MCZO specifically allows, such persons may require different rules, or more of them.  But to the extent rules are required by or suitable for addressing residents' various needs, and the MCZO allows such persons to reside in group homes, it is unreasonable to conclude a home violates the MCZO because it has those rules.  We perceive nothing in the MCZO's text or context that bars a group home operator from employing rules as a tool in its effort to reintegrate its residents into society and to learn to live as independently as possible.

### B.        "Care, training, or support"

¶25        The MCZO defines an allowable group home, in pertinent part, as a location where "staff persons provide on-site *care, training, or*

---

[6]        The superior court explained that inspectors found a list of 38 rules posted in the Home.  By way of example only, the court pointed to the following rules as significantly restricting the residents' movement and activities:  They must not lend, borrow, trade or sell personal belongings; carry money; use the restroom, kitchen, or visit each other's rooms without permission; wear slippers or pajamas during the day around the Home; open their windows; or leave without permission.

*support* for the residents." MCZO § 201 (emphasis added). The definition also specifies that the home and the "services provided therein shall be licensed by, certified by, approved by, registered with, funded by or through, or under contract with the State." *Id.* The superior court concluded that the MCZO does not allow group homes whose "main purpose is to provide treatment to residents." As applied, the court reasoned that Ascend violated the MCZO by providing its residents with group and individual counseling from licensed professionals.

¶26 The Ranas argue the plain language of the group home definition does not exclude on-site group and individual counseling designed to "improve its residents' mental health conditions so as to ready them for independence" because such activities fall within the common meaning of "care" or "training," which the ordinance specifically allows. The County does not dispute that the only forbidden treatment it alleged — and the only activities the superior court found to be violative of the MCZO — were on-site group and individual counseling. When asked at oral argument in the superior court for clarification on what Ascend's group and individual counseling involved, neither party provided further details.

¶27 For its part, the County contends that the absence of the word "treatment" in the MCZO's group home definition means that a group home requires a special use permit to regularly employ methods aimed at improving residents' medical condition or behavioral health issues. The County's argument relies primarily on the testimony of Johnson (the planning and development director), who testified that her department considers "care, training, or support" to mean only "assistance with activities of daily living," *see* A.R.S. § 36-401(38) (defining "[p]ersonal care services"), as defined by the Arizona Department of Health Services' regulations. Those regulations define "activities of daily living" as "ambulating, bathing, toileting, grooming, eating, and getting in or out of a bed or a chair." A.A.C. R9-10-101(5). But the County's contention disregards regulations that separately require behavioral health residential licensees to provide "treatment," A.A.C. R9-10-101(30), defined as "a procedure or method to cure, improve, or palliate an individual's medical condition or behavioral health issue," A.A.C. R9-10-101(236).

¶28 To begin with, contrary to the County's assertion, we do not think that the words "care, training, or support" bear technical meanings. No language in the MCZO informs the reader that "care" is constrained by a statute defining "personal care services," which itself depends on the definition of "activities of a daily living" in a regulation promulgated by a state agency. The lone support for that proposition is a brief remark by

11

Johnson during the evidentiary hearing, with no discussion of how the County arrived at that position, how long it has held the position, or whether it has been reduced to a written policy. What little weight we may grant the County's interpretation under such circumstances is outweighed by the fact that the common meaning of these terms, viewed in context, contemplates a group home offering residents on-site counseling or therapy designed to improve their health conditions. *Cf. BSI Holdings, LLC v. Ariz. Dept. of Trans.*, 244 Ariz. 17, 21, ¶ 17 (2018) (declining to follow an agency's interpretation of a statute where the term did not require technical expertise and the agency's position had not been reduced to written policy).

**¶29** The common meanings of "care" and "training," undefined by the MCZO, each are broad enough to encompass counseling in the group home context. "Care" commonly refers to "attentive assistance or treatment of those in need." *Care,* The American Heritage Dictionary (5th ed. 2011); *see also care*, New Oxford American Dictionary (3d ed. 2010) ("the provision of what is necessary for the health, welfare, maintenance, and protection of someone" such as "health care"). "Training" commonly refers to a method or process of preparing a person for some activity. *See Training,* The American Heritage Dictionary (5th ed. 2011); *accord* Merriam-Webster's Collegiate Dictionary (11th ed. 2014); Webster's New Universal Unabridged Dictionary (1983); New Oxford American Dictionary (3d ed. 2010). As applied here, group and individual therapy designed to improve residents' mental health conditions and to encourage a more independent lifestyle falls within either term. Such therapy assists or treats those in need, namely, the group home's residents. And it is a method to help ready the residents for an activity—living independently.

**¶30** Beyond that, and contrary to the County's contention, nothing in these broad dictionary definitions suggests that they do not include techniques designed to *improve* a health condition. *See Phelps v. Firebird Raceway, Inc.*, 210 Ariz. 403, 407, ¶ 18 (2005) (emphasizing that "a narrow construction" should not typically be placed on "broad and comprehensive language" (quoting *Davis v. Boggs*, 22 Ariz. 497, 507 (1921)). Indeed, dictionary definitions confirm considerable overlap in the meaning of "care" and A.A.C. R9-10-101(236)'s definition of "treatment." Therefore, we see nothing in the common meaning of the words themselves compelling the conclusion that "care, training, or support" cannot include mental-health counseling. *See Cable One, Inc. v. Ariz. Dep't of Rev.*, 232 Ariz. 275, 284, ¶ 42 (App. 2013) (refusing to "read into the statute terms, limits, or requirements that are simply not there").

¶31    Several contextual canons also support the Ranas' argument that counseling falls within the meaning of "care" as used in the MCZO. First, "a word is known by the company it keeps." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). Care, training, and support all share an obvious commonality—they refer to acts or conduct intended to help or assist other persons, *cf. Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326, ¶ 13 (2011), which comports with the fundamental purpose of group homes—to help residents attain skills necessary to live a more independent lifestyle. Providing residents with only enough assistance to merely maintain the status quo would be slim assistance indeed and obviously undermine that purpose.

¶32    Second, when an identical word appears in several places within an ordinance or statutory scheme, unless a contrary indication appears, we presume it has the same meaning in each provision. *State ex rel. Brnovich v. Maricopa Cty. Cmty. Coll. Dis. Bd.*, 243 Ariz. 539, 542, ¶ 12 (2018). Thus, a word used in one provision may be used "elsewhere in a context that makes its meaning clear." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 371 (1988). Contrary to the County's position, other provisions demonstrate that the meaning of "care" includes at least some methods to improve a health condition. The MCZO defines a "hospital" as "an institution for the diagnosis, treatment, or other care of human ailments." MCZO § 201. That provision uses treatment and care as synonyms, both referring to improving or palliating "human ailments." The County's cited example, a provision stating that animal-patients of farm animal clinics "shall not be boarded or lodged except for short periods of observation incidental to care or treatment," MCZO § 1301.1.20.1, suggests nothing different because it too uses the words as synonyms. *See* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts,* 122 (2011) (discussing the "synonym-introducing or").

¶33    The County also argues that because these other provisions indicate the MCZO uses the word "treatment" whenever it means to authorize it, the absence of this word from the group home definition compels the inference that it precludes operators from using any treatment methods to improve their residents' conditions. This argument appears to invoke the interpretive canon *expressio unius*, meaning that the expression of one item implies the exclusion of others; it is "reasonably understood as an expression of all terms included in the statutory grant or prohibition." *See City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 211, ¶ 14 (2019). Here, however, not only does the common meaning of "care" have considerable overlap with the definition of "treatment" that the County contends is forbidden, the MCZO itself uses "care" and "treatment" as

synonyms, or nearly so. The canon is not applicable under these circumstances. *Wells Fargo Credit Corp. v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 165 Ariz. 567, 571 (App. 1990) (explaining that *expressio unius* "does not override our obligation to construe a provision of a statute in the context of related provisions and in light of its place in the statutory scheme.").

**¶34** Finally, the assertion that counseling does not fall within "care, training, or support" because it is designed to improve a health condition would divorce these words from one of the principal purposes of a group home for the mentally disabled. To reiterate, group homes exist to provide such persons with meaningful opportunities for a chance at societal interaction and integration. Regardless of whether group homes ultimately allow such persons to reenter society, at a minimum, group homes necessarily try to improve their residents' disabling conditions. Ascribing a meaning to "care, training, or support" that forbids a group home from achieving that purpose is simply unreasonable in the context of a provision *authorizing* group homes. Any other interpretation of the ordinance turns group homes into smaller versions of institutions that the homes were designed to replace. We therefore conclude that group and individual counseling designed to enable group home residents to achieve the skills needed to foster their independence falls squarely within the meaning of "care, training, or support" under the MCZO.

## CONCLUSION

**¶35** We hold that the superior court properly found that Ascend violated the MCZO by holding company-wide staff meetings at the Home and using it as a site for meetings and care for residents of its other facilities. The court erred, however, in finding that Ascend violated the MCZO by enforcing a list of rules on residents of the Home and by providing group and individual counseling to the residents. Accordingly, we vacate the judgment and remand for entry of an injunction that bars the Ranas and Ascend from (1) using the Home to hold staff meetings for personnel who do not work there, and (2) using it as a site for events or care for residents of its other homes. Otherwise, Ascend may continue using the Home for the care of disabled individuals subject to compliance with its state license and the MCZO, as construed herein.



AMY M. WOOD • Clerk of the Court
FILED:  AA